UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.  No. 1:20-cr-01775-DHU

ALBERTO GOMEZ, a.k.a., "Beto,"
JACK TRUJILLO, a.k.a., "Weezy,"
CEDRIC KULKA, a.k.a. "Brad," and
CHRISTOPHER HULSEY, a.k.a., "Lil C,"

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Jack Trujillo's Motion for Production of Alleged Co-Conspirator Statements and for Pre-Trial Hearing on Their Admissibility (Doc. 162). The Government filed a Response to Motion for Production of Co-Conspirator Statements (Doc. 183), which the Court construes as a motion for pretrial rulings on the admissibility of 15 proffered statements under Fed. R. Evid. 801(d)(2)(E). The Court held a *James* hearing on the motion on August 29, 2022.[1] The Court, having considered the parties' motions, evidence, applicable law, and otherwise being fully advised, grants in part and denies in part the Government's motion to admit the proffered statements pursuant to Fed. R. Evid. 801(d)(2)(E).

---

[1] "A *James* hearing is an evidentiary hearing to establish the existence of a predicate conspiracy for purposes of Rule 801(d)(2)(E). It is named for the case where it originated, *United States v. James*, 590 F.2d 575 (5th Cir. 1979)." *United States v. Otuonye*, 995 F.3d 1191, 1204 n.14 (10th Cir. 2021). "The 'preferred procedure of this circuit' is to hold a James hearing outside the jury's presence to make preliminary findings as to whether" the Rule 801(d)(2)(E) requirements are satisfied. *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021) (quoting *United States v. Alcorta*, 853 F.3d 1123, 1138 (10th Cir. 2017)).

The Court further denies as moot Trujillo's motion because the Government has produced the conspirator statements and the Court has held a pretrial hearing and ruled on their admissibility.

## I. LEGAL STANDARDS

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is "not hearsay" if it "is offered against an opposing party" and it "was made by the party's coconspirator during and in furtherance of the conspiracy." "The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime …. As such, the law deems them agents of one another." *Anderson v. United States*, 417 U.S. 211, 218 n.6 (1974) (citations omitted). Moreover, the statements of coconspirators have a unique evidentiary value that is rarely capable of duplication in live testimony at trial. *United States v. Inadi*, 475 U.S. 387, 395-96 (1986).

"Before admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137; *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The preponderance of the evidence standard merely means "more likely than not." *Bourjaily*, 483 U.S. at 175.

Whether the Rule 801(d)(2)(E) standard is satisfied is a "preliminary question about whether ... evidence is admissible," meaning the district court "is not bound by evidence rules, except those on privilege," when resolving the question. Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 178-79. As the offering party, the government bears the burden of showing the preliminary facts by a preponderance of the evidence. *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (en banc).

"The court may consider both independent evidence and the statements themselves" in determining whether the coconspirator exception applies. *Rutland*, 705 F.3d at 1248; *see also Bourjaily,* 483 U.S. at 180 ("there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy"). The Tenth Circuit requires "at most that there be some independent evidence linking the defendant to the conspiracy." *Alcorta*, 853 F.3d at 1142; *see also United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993) ("most courts require some reliable corroborating evidence apart from the coconspirator's statements before those statements may be used"). However, the independent evidence "need not be 'substantial.'" *Alcorta*, 853 F.3d at 142.

## II. FACTUAL FINDINGS

In making its factual findings, the Court has considered the content of the alleged coconspirator statements themselves, as well as independent evidence of the existence of a conspiracy introduced at the *James* hearings. The Court heard testimony from a single witness, Austin Wozniak ("Wozniak"), a special agent with the Bureau of Alcohol, Tobacco, Firearm and Explosives ("ATF"), whom the Court finds has specialized knowledge through his training and experience about drug trafficking practices and patterns and the use of code words.

In addition, the Government presented evidence Facebook and cellphone conversations that were extracted pursuant to search warrants. The Facebook conversations span from September 8, 2020 through October 3, 2020 and show the names "Weesyf Trujillo," "Chris Hulsey," and others participating in, or authoring, Facebook conversation threads. Govt.'s Ex. 1. Concerning the cellphone evidence, the Government tendered screenshots of cellphone conversations between Defendants Jack Trujillo ("Trujillo") and Alberto Gomez ("Gomez") that

were extracted from Gomez's cellphone. Govt.'s Ex. 2; *James* Hearing Transcript, 66:10-13. ("*James* Hr'g. Tr.") (on file with the Court).[2] The cellphone had the assigned number (505) 359-8933 associated with the contact "Weeze." Govt.'s Ex. 1.[3]

The totality of the evidence, based on Wozniak's testimony and the Facebook and cellphone conversations, establishes the following facts:

In the summer of 2020, law enforcement agents were investigating Defendants for allegations of illegal drug, firearm, and human trafficking activity at Motel 6 locations in Albuquerque, New Mexico. Trujillo allegedly was the drug trafficking conspiracy's leader and went by the street-name of "Weezy." *James* Hr'g. Tr. at 10:3-5; 13:21- 14:1. Cedric Kulka ("Kulka") allegedly was Trujillo's "man in charge" at a Motel 6 located on Avenida Cesar Chavez ("Avenida Motel 6"). *Id*. at 10:7-8. Gomez allegedly acted as Trujillo's "source of supply" of methamphetamine. *Id*. at 10:12-14.

On August 25, 2020, Wozniak and other agents sent an informant to a Motel 6 location on Prospect Avenue ("Carlisle Motel 6") where Trujillo was residing. *Id*. at 11:15-21. The informant reported back that he had observed Trujillo engage in an apparent drug buy. *Id*. at 13:13-17. Acting under agents' direction, the informant then contacted Trujillo to arrange to purchase a quarter pound of methamphetamine from Trujillo the following day. *Id*. at 14:7-9; 15:1-8. In a recorded call, Trujillo told the informant that he was "getting them at four," meaning Trujillo paid his supplier $400 for one ounce of methamphetamine. *Id*. at 54:1-21.

---

[2] This Memorandum Opinion and Order cites to the court reporter's unofficial transcript. All page citations are subject to change based on the official, edited version.

[3] As part of its *James* evidence, the Government also asked the Court to take judicial notice that the federal grand jury found probable cause that a conspiracy existed. *See James* Hr'g. Tr. at 71:2-5. However, the Government has not cited legal authority that an indictment can form part of the evidence establishing a conspiracy. The Court therefore does not consider the grand jury charge as part of the evidence.

On August 26, 2020, the informant and agents arrived at the Carlisle Motel 6. *Id*. at 15:6-10. Agents identified Trujillo based on their review of photographs. *Id* at 16:4-7. According to Wozniak, he observed Trujillo standing in his motel room doorway with two visible firearms in his waistband and engaging in an apparent "hand-to-hand drug transaction" with an unknown individual. *Id*. at 15:11-24. The informant then entered room 128 and covertly recorded the scene. *Id*. at 17:13-25. In the presence of Christopher Hulsey ("Hulsey") and two unidentified women, Trujillo and the informant discussed the methamphetamine buy. *Id*. at 17:3-25.

Trujillo told the informant that he only had two ounces to sell. *Id*. at 17:3-4. The informant came back to the agents' vehicle to obtain money for the purchase, and then reentered the motel room and purchased a substance that tested positively for roughly 50 grams of methamphetamine. *Id*. 17:10-12; 19:23 – 20:3. Later in the day, the informant and agents placed another call to Trujillo to arrange the purchase of another ounce of methamphetamine. *Id*. at 56:3-6. During a recorded call, Trujillo told the informant that another customer of Trujillo's did not pay, so Trujillo "confiscated a zip from him," and told the informant "so if you want that one … Yeah I got one, well maybe it's like almost two, I'm gonna weigh it now. But he didn't have my shit so I took [it] …. It's my dope and everything." Doc. 183 at 4; *James* Hr'g. Tr. at 55:1-20. A "zip" is a street-name for an ounce. *Id*. at 55:14. The informant and Trujillo met, and the informant purchased the third ounce that day in a "vehicle-to-vehicle quick transaction" at a gas station. *Id*. at 20:4-24.

On August 27, 2020, the informant, acting under agents' direction, contacted Trujillo about purchasing a firearm, a stolen vehicle, and additional methamphetamine. *Id*. at 21:20 - 22:4. In a recorded conversation, Trujillo told the informant: "The clear is on the way … coming into town right now. It should be here she [Trujillo's supplier] said by this evening, so I'm gonna

5

call her and get a specific time. I'll be on deck with the thing home, I'll have like a couple pounds." Doc. 183 at 5. "Clear" refers to methamphetamine. *James* Hr'g. Tr. at 57:5-19. The informant told Trujillo to meet at an ATF-controlled location in Albuquerque called the "warehouse." *Id*. at 22:13-24.

The meeting was delayed to the following day, August 28, 2020. *Id*. at 22:7-9. On that date, Trujillo arrived at the warehouse and indicated he could sell the informant another quarter pound of methamphetamine but stated that he wanted to conduct that transaction at the Suburban Motel. *Id*. at 24:22-25; 26:1. After Trujillo departed, agents gave the informant a recording device and arranged for a surveillance team to watch the informant and Trujillo complete the transaction at the Suburban Motel. *Id*. at 24:25 – 25:1-4. Trujillo eventually sold the informant roughly 91 grams of methamphetamine. *Id*. at 26:12-16. During this transaction, Hulsey was again present and "standing in a position where he could [conduct] counter-surveillance." *Id*. at 26:1-8.

On August 31, 2020, ATF utilized two informants to engage in a purchase of 102 grams of methamphetamine from Trujillo. *Id*. at 27:1 – 29-22. In a recorded call with one of the informants, Trujillo directed him to 2361 Mares Road in Albuquerque, which agents later learned was Defendant Alberto Gomez's residence. *Id*. at 27:1-25. Trujillo told the informant, "call me and I'll go outside and wait for you," indicating that Trujillo was inside Gomez's home. Doc. 183 at 5.

On September 1, 2020, ATF directed the two informants to the Avenida Motel 6. *James* Hr'g. Tr. at 30:16-21. The informants were immediately approached by Hulsey and Kulka before they could activate their recording devices. *Id*. at 31:14-16; 32:6-11. Kulka introduced himself as

Trujillo's man in charge of the Avenida Motel 6. *Id*. at 32:17-25.[4] Kulka told the informants that he was in room 217 and could sell a firearm the next day. *James* Hr'g. Tr. at 32:20-21.

On September 2, 2020, the informants returned to the Avenida Motel 6 to complete the controlled firearm purchase with Kulka. *Id*. at 34:5-6. When the informants arrived in the motel parking lot, Trujillo told them that an individual was tied up and being beaten by Kulka. *Id*., at 34:11-21. According to Trujillo, the individual "had [Trujillo's] name in his mouth, that's what fucking happens." Doc. 183 at 5. One of the informants entered the motel room where the victim was. Recordings from the informant's phone showed a distressed individual in a chair. *Id*. at 35:18-25. Both informants later reported that Hulsey, Kulka and several other individuals were in the room. *Id*. at 36:4-6. In post-arrest interviews, Defendants and other witnesses reported that the victim was beat up either because he stole tools, owed a drug debt to Trujillo, or because he was interfering with a drug debt from Hulsey to Trujillo. *Id*. at 37:19-25.

The informants eventually left the motel room, explaining to Kulka and Trujillo that they needed to get cash for the planned firearm purchase. *Id*. at 38:12-22. Instead, they alerted agents about the victim. *Id*. at 38:12-15. The agents discontinued the planned firearm purchase and instead redirected agents to the Motel 6. *Id*. at 39:5-7. Agents eventually breached several motel rooms in rapid succession and conducted arrests. *Id*. at 40:7-8. In a post-arrest interview, Kulka stated that he and Trujillo sold marijuana and that Trujillo paid him $50 to beat the same

---

[4] Statement 10 of the Government's *James* proffer alleges that Kulka told another individual on the scene that he was "Weezy's shooter," and said that Trujillo "fed his wallet and g[ave] [Kulka] money and dope." Doc. 183 at 5. The Court does not find these alleged statements by Kulka to be adequately grounded in the record. First, Wozniak's direct testimony did not mention these statements. *See James* Hr'g. Tr. at 30:16 – 33:25. Second, when specifically asked about Statement 10 later in his testimony, it was not entirely clear the date Kulka made the statements.

individual on a different occasion. *Id*. at 41:8-9. In a later search of Kulka's alleged motel room pursuant to a warrant, agents seized two firearms. *Id*. 41:18 – 42:2.

Hulsey told agents that he was "slinging a little dope for Mr. Trujillo," meaning he was engaged in drug distribution. *Id*. at 43:8-12. After Hulsey was arrested, he and Trujillo communicated on September 3 and 5, 2020 using Facebook. *Id*. at 44:6-20. Trujillo asked Hulsey, "where you at so I can pick up my money[?]" Govt.'s Ex. 1. When Hulsey did not immediately respond, Trujillo wrote "[y]ou just gonna act like you don't no me or owe me NADA." *Id*. Hulsey finally responded that he was "just trying to lay low … them mother fuckers watching all of us," and told Trujillo "I know I owe you brother and I'll pay you …." *Id*. Trujillo responded, "if you are just laying low why the f*** are you calling people for work … if you can call people for work you can pay me my motherfuking money …" *Id*. According to Wozniak, this conversation was about money that Hulsey owed Trujillo for drugs, and Trujillo's response to learning that Hulsey was "looking for methamphetamine from other sources," despite claiming to keep a low profile. *James* Hr'g. Tr. at 44:19 – 45:4.

On September 8, 2020, agents arrested Trujillo after a planned controlled purchase of a quarter pound of methamphetamine at a Day's Inn. *Id*. at 45:14 - 47:2. After the informant placed a drug order from Trujillo during a recorded call, surveilling officers then observed Trujillo and other individuals arrive in a vehicle at Alberto Gomez's alleged residence at 2316 Mares Road. *Id*. at 46:12 – 47:8. The vehicle then departed 2316 Mares Road and Trujillo called the informant and said, "I came around the corner to grab that full thing for you," Doc. 183, which meant that Trujillo was "reassuring his customer that he's getting the promised methamphetamine." *James* Hr'g. Tr. at 66:1-2. The vehicle then traveled to the Day's Inn location and Trujillo was arrested in the vicinity without incident. *Id*. at 47:10 – 48:9.

In Trujillo's post-arrest interview, he identified Gomez as "Beto" and admitted that Gomez was his supplier. *Id.* at 49:1-9. During the interview, Wozniak personally observed two to four calls from a contact on Trujillo's cellphone identified as "Beto." *Id.* at 49:8-25. August 31, 2020 through September 8, 2020, text messages between Gomez and Trujillo show the two discussing prices and meeting. Govt.'s Ex. 1.[5]

On September 10, 2020, law enforcement officers executed a search warrant of 2316 Mares Road, Gomez's alleged residence. *Id.* at 50:24 - 51:7. Officers seized about two ounces of methamphetamine and a small quantity of heroin, among other things. *Id.* at 52:10-13. Gomez admitted to selling about an ounce of methamphetamine daily for the past 30 days told officers that he occasionally supplied Trujillo quarter-pound quantities. *Id.* at 52:17-24.

### III. CONCLUSIONS OF LAW

**A. Whether A Conspiracy Existed Involving Defendants and the Declarant**

To admit the alleged coconspirator hearsay, the Court must first find that a conspiracy existed and that Defendants and the declarant were members of that conspiracy.[6] *See Alcorta*, 853 F.3d at 1137. To find that a conspiracy existed, there must be proof of four elements: (1) there was an agreement to violate the law; (2) the declarant knew the essential objectives of the

---

[5] Agent Wozniak testified that at one point in the text message thread Gomez and Trujillo talked about a "quarter-pound" or "QP." *James* Hr'g. Tr. at 66:14-15; 67:16. However, the Court's independent review of the text messages reveals no such conversation – at least not explicitly. Gomez did say that he could "grab that quper" which perhaps was reference to a drug weight. But Wozniak did not provide an interpretative analysis of this statement. The Court therefore conditionally excludes any reference to the text messages discussing a "QP" or "quarter pound," unless a government witness can establish a foundation that the messages referred to drug weights.

[6] The Government contended that Defendants were part of multiple conspiracies, such as firearm and stolen vehicle conspiracies. *See James* Hr'g. Tr. at 111:2-5. The Court does not adjudicate or decide whether such conspiracies existed. The Court only finds that a 21 U.S.C. § 846 conspiracy existed.

conspiracy; (3) the declarant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. *United States v. Rutland*, 705 F.3d 1238, 1249 (10th Cir. 2013) (citation omitted). The Court will provide more detail about these elements below.

Concerning the first element, an agreement to violate the law, in 21 U.S.C. § 846 conspiracy cases an agreement to violate the law "need not be explicit, but rather may be inferred from the facts and circumstances of the case. An agreement to distribute drugs can sometimes 'rationally be inferred' from 'frequent contacts' among the defendants and from 'their joint appearances at transactions and negotiations.'" *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (quoting *United States v. Esparsen,* 930 F.2d 1461, 1472 (10th Cir. 1991)).

Regarding the second element, to prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendants knew all the details or all the members of a conspiracy. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged co-conspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (citing *Evans*, 970 F.2d at 669). "[B]ecause a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence." *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009) (citation and internal quotation marks omitted).

Under the third element, participation, "[a] conspirator 'need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy,' but he or she must have a 'general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator.'" *United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (quoting *Evans*, 970 F.2d at 669-70). "[M]erely associating with known criminal conspirators or

purchasing drugs for personal use is insufficient to prove participation in a conspiracy; rather, the defendant's participation must share a common purpose or design with his co-conspirators." *Id.* (citation omitted).

The fourth element of conspiracy, interdependence, is the "focal point of the analysis is whether the alleged coconspirators' conduct exhibited interdependence." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (quoting *United States v. Edwards,* 69 F.3d 419, 432 (10th Cir. 1995)). In the context of drug conspiracies, for example,

> It is not enough that a group of people separately intend to distribute drugs in a single area, nor even that their activities occasionally or sporadically place them in contact with each other. People in the same industry in the same locale (even competitors) can occasionally be expected to interact with each other without thereby becoming coconspirators. What is needed is proof that they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged.

*Id.* at 1330 (quoting *Evans,* 970 F.2d at 670-71) (emphases in original).

Interdependence "may be shown when a defendant's activities 'facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole.'" *Pickel*, 863 F.3d at 1252-53 (quoting *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1124 (10th Cir. 2011)). "[O]f principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *Id.* at 1253 (citation omitted). "[A] single act can be sufficient to demonstrate interdependence." *Caldwell*, 589 F.3d at 1329 (citing *Hamilton,* 587 F.3d at 1208–09).

With this background in mind, the Court concludes that the Government has met its burden of showing by a preponderance of the evidence the existence of a conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 as charged in Count 1 of the Superseding

11

Indictment. Many of the proffered statements are based reports by confidential informants describing first-hand participation in observing, discussing or even effecting drug deals involving some of the Defendants or describing the actions of the coconspirators. The Court finds that the Government has shown by a preponderance of the evidence that a predicate conspiracy to distribute methamphetamine existed.

The Court also finds that the preponderance of the evidence shows that the declarant and the Defendants were members of the conspiracy. Evidence linking Jack Trujillo to the conspiracy includes his participation in numerous controlled drug purchases in which he delivered physical drugs to the informant, his statements on recorded phone calls and social media tending to show that he was engaged in drug transactions, and his connections to Hulsey, Gomez, and Kulka. *See Evans*, 970 F.2d at 671-72 (sufficient evidence of defendant's membership in conspiracy included, *inter alia*, evidence of drug sales to other conspirators and drug-related conversations and an attempted controlled buy with an informant). Evidence linking Christopher Hulsey to the conspiracy includes his presence with Trujillo during an August 26, 2020 discussion about a methamphetamine purchase and his presence at a controlled purchase of methamphetamine at the Suburban Motel. *See United States v. Gutierrez*, 576 F.2d 269, 273-74 (10th Cir. 1978) (defendant's presence during part of conversation about trading diamonds for heroin, coupled with completion of the transaction unquestionably identified the defendant as a member of the conspiracy). Evidence linking Cedric Kulka to the conspiracy includes his statement to informants that he was Trujillo's man in charge of the Avenida Motel 6, which linked Kulka to the Trujillo and connected Kulka to the larger conspiracy. *See Evans*, 970 F.2d at 672 (sufficient evidence of defendant's participation in drug conspiracy included, *inter alia*, evidence that he was the drug dealer's "worker[ ]"); *Caldwell*, 589 F.3d at 1329 ("[A] single act can be sufficient

to demonstrate interdependence" and to show that an individual intended to act for the "shared mutual benefit" of the conspiracy). Evidence linking Alberto Gomez to the conspiracy includes the August 31, 2020 and September 8, 2020 controlled drug purchases which linked Trujillo to Gomez's home at 2316 Mares Road.

In summary, a preponderance of the evidence shows that a conspiracy to distribute methamphetamine existed and that Defendants participated in that conspiracy, thereby satisfying the first and second prerequisites for admissibility under Rule 801(d)(2)(E).

### B. Whether Statements Were Made "During the Course" of and "In Furtherance" of the Conspiracy

The third prerequisite for admissibility under Rule 801(d)(2)(E) is that the statements "were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137. A coconspirator statement is made "during the course" of the conspiracy "if it is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (internal quotation marks omitted). Statements made by co-conspirators during the conspiracy are admissible against a defendant who subsequently joins the conspiracy. *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991). However, to avoid improperly broadening the scope of conspiracy prosecutions, the court "must carefully ascertain the nature and extent of a conspiracy in determining whether acts or statements can properly be viewed as made during its existence." *Perez*, 989 F.2d at 1579.

"In furtherance" means that the statements are "intended to promote the conspiratorial objectives." *Rutland*, 705 F.3d at 1252 (quoting *Townley*, 472 F.3d at 1273). This requirement is meant "to strike a balance between the great need for conspirators statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported

and deliberately fabricated evidence." *Alcorta*, 853 F.3d at 1137 (quoting *Perez*, 989 F.2d at 1578). The Tenth Circuit requires courts to interpret the "in furtherance" requirement "narrowly" and in a way that is "protective of defendants." *Perez*, 989 F.2d at 1578 (citation omitted). The focus is on the declarant's intent to further the conspiracy in making the statement, rather than on the statement's effect. *Id.* "No talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy. To the contrary, this determination must be made by examining the context in which the challenged statement was made." *Id.* at 1578-79.

Examples of statements the Tenth Circuit has held to be in furtherance of a conspiracy include

> statements explaining events of importance to the conspiracy, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members.

*Id.* Additionally, statements identifying members of a conspiracy, discussing particular roles of other coconspirators, and avoiding detection by law enforcement personnel are made "in furtherance of" a conspiracy. *United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir. 1995).

On the other hand, "statements are not in furtherance of the conspiracy if they are mere narratives, that is statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." *Alcorta*, 853 F.3d at 1137 (internal quotation marks omitted); *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988) ("mere narratives are statements by a coconspirator which were either mere conversations or casual admissions of culpability to someone [they] had decided to trust") (citation and internal quotation marks omitted).

Applying this standard, the Court concludes that the Government has not met its burden of showing that all the proffered statements were made in furtherance of the conspiracy. The Court organizes its rulings on the Government's proffered statements below by categorizing them as admissible or inadmissible under Rule 801(d)(2)(E). The Court then gives a brief explanation of its ruling.

### 1. Admissible Statements Under Rule 801(d)(2)(E)

#### a. Statements Made by Trujillo About Drug Transactions

Statements 1, 2, 3, 4, 6, and 13: These statements are recorded telephone calls allegedly made by Trujillo to a confidential informant on the dates in the charged conspiracy. The Court concludes that these communications direct or facilitate particular actions which the Government has shown by sufficient evidence were a part of the alleged predicate conspiracy to distribute methamphetamine. For example, the statements include Trujillo's discussion about drug orders and prices, an update on the status of methamphetamine purchase, a discussion about another buyer's drug debt, a mention of Trujillo's supplier, and an instruction to meet at Gomez's home. Statements made by a coconspirator to conduct the business of the conspiracy itself are admissible. *See United States v. Caro*, 965 F.2d 1548, 1557 (10th Cir. 1992) (intercepted phone calls of coconspirators discussing "drug-related conversations" to "facilitate[ ] meetings … clearly furthered the conspiracy ….") The Court concludes that a preponderance of the evidence shows that Statements 1, 2, 3, 4, 6, and 13 were part of the alleged predicate conspiracy and are admissible under Rule 801(d)(2)(E).

#### b. Statement by Kulka About His Role

Statement 9: Statements 9 is an alleged statement by Kulka made to the informants on September 1, 2020 that he was "Weezy's guy in charge." The Court concludes that Kulka's

15

statement is admissible under Rule 801(d)(2)(E) because "statements of identity and of a particular individual's role in the conspiracy" are in furtherance of a conspiracy. *Williamson*, 53 F.3d at 1520. The Court concludes that a preponderance of the evidence shows that Statement 9 was part of the alleged predicate conspiracy and is admissible under Rule 801(d)(2)(E).

### c. Text Messages Between Gomez and Trujillo

Statement 14: Statement 14 consists of numerous underlying text messages between Trujillo and Gomez from August 31, 2020 through September 8, 2020. According to Wozniak, many of the text messages were about the logistics of the conspiracy. Text messages which facilitate the business of the conspiracy are admissible. *See United States v. Cushing*, 10 F.4th 1055, 1069 (10th Cir. 2021) (text message exchange about "weights" and negotiation over payment, among other things, furthered drug conspiracy). The Court therefore concludes that a preponderance of the evidence shows that the several underlying text message which comprise Statement 14 were part of the alleged predicate conspiracy and are admissible under Rule 801(d)(2)(E).

However, the Court will not, at this stage, allow testimony from Wozniak that the texts contained a reference to a discussion about transacting a "quarter pound" or "QP." The Court's independent review of the text messages does not reveal a conversation using those terms. The Court therefore conditionally excludes any reference to the text messages discussing a "QP" or "quarter pound," unless a government witness can establish an evidentiary foundation that the messages referred to drug weights.

### d. Facebook Conversations Between Trujillo, Hulsey and Others

Statement 15: This statement also comprises multiple Facebook conversations from September 8, 2020 through October 3, 2020. The names "Weesyf Trujillo," "Chris Hulsey," and

others are participating in, or authoring, Facebook conversation threads. The Government has shown by a preponderance of the evidence that the Facebook communications facilitated drug transactions and involved a discussion about drug debts which were made in furtherance of conspiracy to distribute methamphetamine. The Facebook conversations comprising Statement 15 were part of the alleged predicate conspiracy and are admissible under Rule 801(d)(2)(E).

### 2. Statements Not Admissible Under Rule 801(d)(2)(E)

#### a. Statements About Firearms and/or Stolen Vehicles

Statements 5, 7 and the Last Sentence of Statement 9: These are statements allegedly made by Trujillo or Kulka about selling firearms and/or stolen vehicles. The Government has not linked these communications to other allegations of wrongdoing nor shown that they facilitated the overall conspiracy to distribute methamphetamine. The Court finds these statements are at most "mere narrative" relating to past events or facts that were perhaps generally connected with the conspiracy, but were not made in furtherance of it. *Perez*, 989 F.2d at 1578.

#### b. Statement by Kulka that Trujillo Fed Kulka's Wallet and Gave Him Money and Dope

Statement 10: According to the Government, Kulka stated that Trujillo "fed" Kulka's wallet and "g[ave] [Kulka] money and dope." Doc. 183 at 5. The *James* hearing record does not support this proffer. First, Wozniak's direct testimony did not mention these statements. *See James* Hr'g. Tr. at 30:16 – 33:25. Second, when specifically asked about Statement 10 later in his testimony, it was not entirely clear when Kulka allegedly made the statements. Because the evidentiary record does not support the allegations therein, Statement 10 will be excluded.

#### c. Statements About Paying for Motel Rooms and Statements During the Alleged Kidnapping

Statements 8, 11, 12: Statement 8 is Trujillo's statement to another coconspirator that he would pay for his motel room. Statements 11 and 12 are September 2, 2020 statements by Trujillo that Kulka was beating an individual who "had [Trujillo's] name in his mouth" and statements by Trujillo and Kulka about "shoot[ing]" or "hit[ting]" the individual. The Court finds that these statements also mere narratives or "idle chatter of criminal partners," *Perez*, 989 F.2d at 1578, that have "no immediate or future conspiratorial purpose." *Alcorta*, 853 F.3d at 1137.

## IV. SUMMARY OF RULINGS

For ease of reference for the parties, the Court summarizes the rulings explained above in the following table:

| PROFFERED STATEMENT | RULING |
|---|---|
| 1 | Admissible under Rule 801(d)(2)(E) |
| 2 | Admissible under Rule 801(d)(2)(E) |
| 3 | Admissible under Rule 801(d)(2)(E) |
| 4 | Admissible under Rule 801(d)(2)(E) |
| 5 | Not admissible under Rule 801(d)(2)(E) |
| 6 | Admissible under Rule 801(d)(2)(E) |
| 7 | Not admissible under Rule 801(d)(2)(E) |
| 8 | Not admissible under Rule 801(d)(2)(E) |
| 9 | Partially admissible under Rule 801(d)(2)(E). The Court excludes Kulka's alleged statement about selling a firearm |
| 10 | Not admissible under Rule 801(d)(2)(E) |
| 11 | Not admissible under Rule 801(d)(2)(E) |
| 12 | Not admissible under Rule 801(d)(2)(E) |

| 13 | Admissible under Rule 801(d)(2)(E) |
|---|---|
| 14 | Partially admissible under Rule 801(d)(2)(E). The Court conditionally excludes any reference to the text messages discussing a "QP" or "quarter pound," unless a government witness can establish an evidentiary foundation that the messages referred to drug weights. |
| 15 | Admissible under Rule 801(d)(2)(E) |

## V. CONCLUSION

For the reasons set forth above, the Government's Response to Motion for Production of Co-Conspirator Statements **(Doc. 183)**, construed as a motion for pretrial rulings on the admissibility of evidence under Fed. R. Evid. 801(d)(2)(E) is **GRANTED IN PART** and **DENIED IN PART** as described in detail above. Defendant Jack Trujillo's Motion for Production of Alleged Co-Conspirator Statements and for Pre-Trial Hearing on Their Admissibility **(Doc. 162)** is **DENIED AS MOOT** because the Government has produced the *James* proffers and the Court has held a hearing on their admissibility.

**IT IS SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE