IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                Case No. 1:20-cr-01775-MLG-1

ALBERTO GOMEZ,

    Defendant.

**MEMORANDUM OPINION AND ORDER
ON DEFENDANT'S SENTENCING OBJECTIONS**

Defendant Alberto Gomez objects to the imposition of two separate sentencing enhancements that increase his total offense level by four points. *See* Doc. 417 at 1-9. He first challenges a two-level enhancement for possession of a firearm in connection with a drug trafficking offense. U.S.S.G. § 2D1.1(b)(1); Doc. 375 at 11 ¶ 36; Doc. 417 at 6-9. His other objection concerns the proposed imposition of a two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance per U.S.S.G. § 2D1.1(b)(12). *See* Doc. 375 at 11 ¶ 37; Doc. 417 at 2-6. The United States argues both enhancements are warranted based on the relevant facts and the supporting evidence presented at the hearing on this matter. *See generally* Docs. 421, 426.

Having considered the parties' arguments, the Court agrees with the Government and overrules Gomez's objections. The Government has met its burden to demonstrate that the pistol discovered at Gomez's residence was used in connection with the relevant drug-trafficking offenses and Gomez has not shown that it was "clearly improbable" that the pistol was used for other reasons. And so, the Court holds that Section 2D1.1(b)(1) applies. The Court will also impose a two-level enhancement under Section 2D1.1(b)(12) because the United States has proven by a

1

preponderance of the evidence that distributing drugs was one of Gomez's primary uses of his residence. The Court's reasoning and factual findings are set forth below.

## BACKGROUND[1]

During the evidentiary hearing on this matter, Special Agent Austin Wozniak with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") explained the events precipitating the arrest of Gomez and his co-defendant, Jack Trujillo. *See* Doc. 426 at 5-46. In short, an ATF confidential informant ("CI") conducted numerous drug transactions with Trujillo. Doc. 375 at 5 ¶ 11-7 ¶ 18. Later in the investigation, and after his arrest, Trujillo identified Gomez as his source of supply for methamphetamine. *Id.* at 6 ¶ 14, 7 ¶ 19; Doc. 426 at 10:19-22. Based on this information, the ATF obtained and executed a search warrant of Gomez's residence, including his room which was a converted garage attached to the single-story house. Doc. 426 at 10:23-25, 11:5-7, 11:19-20. During the search, federal agents discovered approximately 55.45 grams of methamphetamine, a pistol in a black bag under the bed, numerous rounds of ammunition, and some drug paraphernalia (e.g., baggies and syringes).[2] *See* Gov. Ex. 1 at 1-4; Gov. Exs. 2, 3 (photographs of the pistol); Doc. 417-1 at 3; Doc. 417-2 at 1-2; Doc. 426 at 11:21-25, 13:5-8. The firearm had an extended magazine and was loaded with nine-millimeter caliber ammunition.[3] Doc.

---

[1] The Court draws these facts from the Presentence Report ("PSR"), Doc. 375, and those established by evidence the parties admitted during the October 10, 2024, sentencing hearing. *See* Fed. R. Crim. P. 32(i)(3)(A) (the Court "may accept any undisputed portion of the presentence report as a finding of fact").

[2] The PSR erroneously indicates that the pistol and the methamphetamine were located in separate rooms. Doc. 375 at 7-8 ¶ 19. In an addendum to the PSR, the United States Probation Office ("Probation") acknowledged and corrected this inaccuracy, stating that the pistol and the methamphetamine were indeed found in the same room. Doc. 419 at 3.

[3] Gomez challenges whether the pistol was loaded because the narrative reports produced after the search do not refer to the gun as either "loaded" or "unloaded." Doc. 417 at 8 n.3; Doc. 426 at 47:13-16; *see, e.g.*, Doc. 417-2 at 3 ¶ 3g.

426 at 15:2-10. No laboratory equipment, scales, packaging materials, large amounts of cash, or physical ledgers were recovered. *Id.* at 62:11-63:8.

After the search, Wozniak separately interviewed Gomez, his brother (Alejandro Gomez), and his nephew (Armando Gomez).[4] *Id.* at 11:8-15, 19:16-22, 38:15-18; Gov. Exs. 5 (report of investigation documenting interview), 11A, 11B, 12, 13 (transcripts of the interviews).[5] Alejandro told Wozniak that he, Armando, and Gomez all occupied the same house and that Gomez primarily lived in the converted garage.[6] Gov. Ex. 13 at 5:19-6:2; *see* Doc. 426 at 38:25-39:17. Alejandro also explained that he avoided Gomez because of his drug use, that the house had been shot, and he believed Gomez had been selling drugs for a year. Gov. Ex. 13 at 4:12-14, 4:23-5:1, 6:22-7:4; *accord* Gov. Ex. 12 at 4:11-25 (Armando describing the shooting). He told agents that approximately fifteen people would visit Gomez at the residence each day, Gov. Ex. 13 at 7:5-20; Gov. Ex. 5 at 1 ¶ 2, and while he stated he never personally observed any drug transactions take place, Alejandro believed the visitors were getting high. Gov. Ex. 13 at 6:7-9.

Following that conversation, Wozniak interviewed Gomez. He described his role as a "source of supply" for Trujillo. *See* Doc. 426 at 10:19-22 (Wozniak recounting the conversation). Gomez said that Trujillo would pick up an ounce or two of methamphetamine about two to three times a week.[7] Gov. Ex. 11A at 17:18-18:8. Additionally, Gomez told Wozniak about other details relevant to his drug-associated activities, including his heroin use and distributing it to "random

---

[4] Alejandro and Armando Gomez are subsequently referred to by their first names for clarity.

[5] These three men were the only individuals present at the residence when the search occurred. *See* Doc. 426 at 63:9-13 (describing how no "employees" were at the residence).

[6] Armando confirmed Alejandro's statements. Gov. Ex. 12 at 5:19-23.

[7] Gomez also said that roughly nine days prior to the search, his supplier fronted him a quarter pound of methamphetamine, which he then provided to Trujillo in exchange for two-hundred dollars. Gov. Ex. 11A at 15:14-16:13; Gov. Ex. 11B at 12:5-7.

3

people." *Id.* at 4:11-16, 18:22-19:5; *see also id.* at 19:13-20 (Gomez stating he would smoke pills but would not sell them). Gomez admitted that he sold drugs for a year, and during the month preceding the search, his supplier would give him about an ounce, sometimes more, of methamphetamine which he would sell the same day. Gov. Ex. 11B at 4:23-5:10, 7:6-8:25, 11:24-12:4; *see* Doc. 426 at 27:7-9 (Wozniak confirmed that Gomez estimated he would sell about an ounce a day the month before the search); Gov. Ex. 5 at 2 ¶ c. This supplier would occasionally come to Gomez's house to drop off the methamphetamine. Gov. Ex. 11B at 14:1-4, 23:4-10. Gomez then clarified that while numerous people would visit the residence each day, as Alejandro stated, he did not sell drugs to each of those individuals, and he regarded some of them as his friends. Gov. Ex. 11A at 21:6-19; Gov. Ex. 11B at 2:17-3:3 (reaffirming that he would not sell drugs to everyone at the home). Nevertheless, Gomez admitted that he made approximately four or five drug sales per day at the house. Gov. Ex. 11A at 20:23-21:16.

As to the loaded pistol, Gomez denied ownership. He said it belonged to his friend "Mike." Gov. Ex. 11B at 36:22-37:14, 38:17-19, 40:21-23. Gomez told Wozniak that Mike brought the weapon to the residence to gauge Gomez's interest in purchasing the firearm. *Id.* at 43:4-9, 44:1-8; Gov. Ex. 5 at 2 ¶ h; Doc. 426 at 30:13-16. However, Gomez confessed to owning the bag which contained the pistol. Gov. Ex. 11B at 43:10-17; Doc. 426 at 30:16-20. He also admitted ownership of the ammunition found in the converted garage. Gov. Ex. 11B at 41:14-42:10. Additionally, Gomez described prior shootings at his house and explained that he installed a security apparatus on the door to the converted garage for his protection because the residence had been robbed. Doc. 426 at 37:14-38:11; Doc. 417-2 at 2 ¶ e.

Ultimately, Gomez pled guilty to four counts of the Second Superseding Indictment including possession with the intent to distribute five grams and more of methamphetamine,

conspiracy to distribute fifty grams and more of methamphetamine, possession with intent to distribute fifty grams and more of methamphetamine, and being a felon in possession of a firearm and ammunition. Doc. 366 at 5-6; *see* Doc. 375 at 4 ¶ 2. As currently calculated by Probation, with the challenged enhancements, Gomez's total offense level is 33. Doc. 375 at 12 ¶ 45.

## DISCUSSION

### I. Possession of a Dangerous Weapon

Section 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed," the district court should enhance the defendant's sentencing guidelines by two levels. The committee commentary provides that the enhancement should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A).[8] The Government bears the initial burden of proving by a preponderance of the evidence "a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Pompey*, 264 F.3d 1176, 1180-81 (10th Cir. 2001) (quoting *United States v. Roederer*, 11 F.3d 973, 982 (10th Cir. 1993)); *accord United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999) ("The government meets its initial burden when it shows that a weapon was located near the general location where at least part of a drug transaction occurred."). If the Government meets this burden, then the defendant must demonstrate that it was "clearly improbable that the weapon was connected to the offense." U.S.S.G. § 2D1.1 cmt. n.11(A); *United States v. Foy*, 641 F.3d 455, 470 (10th Cir. 2011).

Here, the ATF's search of Gomez's residence uncovered the pistol in the converted garage alongside about two ounces of methamphetamine. Doc. 426 at 13:5-11, 16:13-17. Gomez admitted

---

[8] A Guidelines comment is "authoritative unless is violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993); *see United States v. Babcock*, 40 F.4th 1172, 1184 (10th Cir. 2022).

he would distribute an ounce of methamphetamine four to five times a day from the garage. Gov. Ex. 11A at 20:23-21:19; Doc. 366 at 7. Further, Gomez told the ATF that he knew about the firearm and handled it the night prior to the search. Gov. Ex. 11B at 43:3-9, 44:1-4. He also owned the bag in which it was found.[9] *Id.* at 43:10-17; Doc. 426 at 30:16-20. These admissions weigh in favor of applying U.S.S.G. § 2D1.1(b)(1).

Additional factual considerations support application of the enhancement. For example, due to the inherently dangerous nature of drug trafficking it is common for drug dealers to possess firearms—so-called "tools of the trade"—to protect themselves, their supply, and their locale. Doc. 426 at 17:2-25 (Wozniak testifying about the connection between firearms and drug trafficking); *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991) (noting that firearms, inter alia, are "'tools of the trade'—that is, means for the distribution of illegal drugs"). Here, the pistol was readily accessible under Gomez's bed and in the same room as the seized methamphetamine and other narcotics. Doc. 419 at 3 (correcting the PSR, Doc. 375 at 7 ¶ 19); *see* Doc. 417-1 at 3; Gov. Ex. 1. Accessibility to the weapon, its proximity to drugs, and the efforts made to burglar-proof Gomez's home strongly suggest that the firearm was used as a tool of the trade. *See* Doc. 426 at 17:19-25 (Wozniak defining "tools of the trade"), 48:19-49:11 (Wozniak testifying about the pistol's nexus to drugs). As such, the pistol could have been used to either further Gomez's multiple daily drug transactions or to protect the residence. *See id.* at 50:14-51:12 (Wozniak agreeing Gomez likely used the gun to protect his home, which indicated the weapon was connected to drug trafficking); *cf. United States v. Hargrove*, 911 F.3d 1306, 1331-32 (10th Cir. 2019) (comparing the safety-valve reduction to Section 2D1.1(b)(1) and noting "loaded guns

---

[9] Gomez's plea agreement confirms these facts. Doc. 366 at 7; Gov. Ex. 10 at 7.

certainly [have] the potential to fulfill [a] protective purpose" and "to facilitate the drug-trafficking offense").

Given the preceding, the Court finds that the Government has shown by a preponderance of the evidence that the pistol was a tool of the trade located in the same place as ongoing drug transactions. But that is not the end of the inquiry. Because the United States has cleared the initial hurdle of showing a temporal and spatial relationship among the weapon, Gomez, and his drug trafficking activities, the burden shifts to Gomez to show that the enhancement should not apply, like offering an alternative lawful reason for possessing the gun to avoid application of the enhancement. *See Pompey*, 264 F.3d at 1181; *United States v. Smith*, 131 F.3d 1392, 1400 (10th Cir. 1997). However, to date, Gomez has proffered no credible evidence suggesting he possessed the firearm lawfully or that it was "clearly improbable" that the pistol was connected to the drug trafficking.[10] *See* U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A); *see, e.g.*, Doc. 366 at 7 (admitting he was a convicted felon and knew he was not allowed to possess firearms). Gomez's assertions that the gun belonged to his friend Mike are dubious and unpersuasive. Gov. Ex. 11B at 36:22-37:14, 38:17-19, 43:4-9, 44:1-8; *see, e.g.*, *Vaziri*, 164 F.3d at 568 (noting that evidence defendants were "merely storing guns for other persons" fails to carry the "clearly improbable" burden); *United States v. Twaddle*, No. 20-2128, 2021 WL 5122282, at *8 (10th Cir. Nov. 4, 2021) (rejecting the defendant's argument that weapons were improbably connected because the district court could infer knowledge about them after someone suggesting hiding them). Accordingly, the Court overrules Gomez's objection and will apply the Section 2D1.1(b)(1) sentencing enhancement.

---

[10] The facts presented are plainly dissimilar to the Guidelines' example of a firearm—an "unloaded hunting rifle in the closet"—that would militate against the enhancement's application. U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A). Under those circumstances, it would be "clearly improbable" that the hypothetical weapon was connected to drug trafficking instead of hunting.

**II.     Maintaining a Premises for Drug Distribution**

The Guidelines specify that a two-level increase is warranted "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). When determining whether a defendant "maintained" the premises, some factors district courts should consider include: (A) if "the defendant held a possessory interest in (e.g., owned or rented) the residence, and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id.* cmt. n.17. Storing and selling drugs need not be the sole purpose of the residence, "but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.*

The parties agree that Gomez primarily occupied the converted garage; both Alejandro and Armando confirmed as much. *See* Gov. Ex. 13 at 5:19-24; Gov. Ex. 12 at 5:14-16, 6:2-6. Gomez argues he did not have a possessory interest in the home such that he "maintained" it because he did not own or rent from his family and his brother intended to sell the home "out from under him." Doc. 417 at 4. Indeed, Alejandro told investigators that he wanted to sell the house. *See, e.g.*, Gov. Ex. 13 at 4:9-10 (Alejandro stating, "I told him I was going to sell the house."), 4:19-20 ("My real estate agent has my paperwork to the house because I'm going to sell it."). Yet, Alejandro's desire to move was motivated by the effects of Gomez's conduct on both Alejandro and Armando's home-life. *Id.* at 4:20-21 ("I don't want no part of it."), 9:1-2 ("So they go into [Armando's] room. They take [stuff]. They [ ] have no respect for us."), 9:15-18 (Alejandro stating it was "awful" and he would not cook in the kitchen nor do laundry in the residence). While Gomez may not have financially contributed to the maintenance of the home, he resided there at the time of the search, had personal belongings in the house, and his activities dictated how his co-habitants lived. *See* U.S.S.G. § 2D1.1(b)(12) cmt. n.17. That Gomez did not pay to live at the residence is not

8

dispositive. *See, e.g.*, *United States v. Fuentes-Ontiveros*, 920 F. Supp. 2d 1198, 1202 (D.N.M. 2012) (concluding the defendant "maintained" the house despite not having a possessory interest because he lived there, "stored his personal property in one of the bedrooms, came and went freely, and participated actively in the drug operations there"). Accordingly, the Court finds that Gomez maintained the residence for purposes of Section 2D1.1(b)(12).

Next, the Court must "consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently [it] was used by the defendant for lawful purposes." U.S.S.G. § 2D1.1(b)(12) cmt. n.17; *United States v. Murphy*, 901 F.3d 1185, 1191 (10th Cir. 2018) ("The commentary does not require a comparison of the frequency of lawful and unlawful activity. It requires only that a court 'consider' such frequency[.]"). "[F]or drug-related activity to constitute a primary use of the residence, it must not only be frequent but also substantial." *Murphy*, 90 F.3d at 1191. Resolution of the inquiry is made through careful consideration of several factors including:

(1) the frequency and number of drugs sales occurring at the home;

(2) the quantities of drugs bought, sold, manufactured, or stored in the home;

(3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home; and

(4) the significance of the premises to the drug venture.

*Id.* at 1191-1192 (citing *United States v. Verners*, 53 F.3d 291, 296-97 (10th Cir. 1995)).

With this legal background in mind, the Court turns to the instant facts. Every day, Gomez would sell methamphetamine to four or five buyers. Gov. Ex. 11A at 20:23-21:19. Each of these

transactions occurred at his residence. *Id.* at 20:23-21:5.[11] Gomez would receive a one-ounce supply of methamphetamine from his supplier every day, and those deliveries were sometimes made to his residence. Gov. Ex. 11B at 4:23-5:10, 7:6-10, 7:15-16, 11:23-12:4, 14:1-4, 23:4-7. Gomez would then divvy up the drugs and sell to his customers.[12] *Id.* at 7:17-20; *see* Doc. 426 at 18:11-19:3 (Wozniak describing Gomez's style of dealing), 58:6-16 (qualifying "'retail' dealing"), 59:14-22 (Wozniak testifying fifty-five grams of methamphetamine was beyond personal-use quantity but less than supplier-level). The Court finds Gomez's drug-related activities are sufficiently frequent to establish that a primary purpose for maintaining his residence was drug distribution. That the number and quantity of the sales are both relatively minor does not alter the conclusion. *See Murphy*, 901 F.3d at 1191 (remarking "an exquisitely frequent, but relatively paltry, operation" can support applying the enhancement).

Further, agents found various tools of the trade known to be associated with drug trafficking at Gomez's residence. Specifically, the ATF found a pistol, multiple rounds of assorted ammunition, a gun case, plastic baggies with suspected heroin, syringes containing liquid, and

---

[11] Probation relied on the volume of visitors to the residence to substantiate applying this enhancement. Doc. 375 at 7 ¶ 19 ("[H]is brother and minor nephew[] both . . . confirmed that he was likely involved in drug trafficking, as he received approximately 15 visitors every day.").

[12] Gomez explained he would also sell heroin, Gov. Ex. 11A at 18:22-19:5, but it is unclear if these sales took place at the residence as well. Further, Gomez admitted to supplying Trujillo with an ounce or two of methamphetamine multiple times during a week, as well as a quarter pound of methamphetamine days preceding the search, but it is similarly unclear where these transactions occurred. *Id.* at 12:24-13:9, 15:19-16:18, 17:18-18:18; Gov. Ex. 11B at 12:8-24. Though it does not inform this Court's ultimate conclusion, it is notable that Gomez's residence was also a significant point of contact for Gomez's role as Trujillo's source of supply for Trujillo's drug trafficking—Trujillo met the CI on the house's driveway to sell a quarter pound of methamphetamine after obtaining that quantity from Gomez. *See* Doc. 375 at 6 ¶ 14; *see also* Gov. Ex. 11A at 12:19-13:3 (Wozniak stated the ATF followed Trujillo from Gomez's residence, executed an arrest warrant, and found methamphetamine in the vehicle); *accord* Doc. 426 at 49:1-2.

assorted pills. Gov. Ex. 1 at 1-3; Doc. 417-1 at 2; Doc. 417-2 at 2 ¶¶ f-g; *see United States v. Cantrell*, 817 F. App'x. 614, 619 (10th Cir. 2020) (upholding application of Section 2D1.1(b)(12) stating, "we have concluded that the presence of such tools of the trade in a residence provides significant support for the application of the § 2D1.1(b)(12) enhancement"); *Martinez*, 938 F.2d at 1083 (including "uncharged quantities of illegal drugs" as tools of the trade). Given that Gomez's residence was the primary (if not only) location for his daily drug distribution, *see* Doc. 417-2 at 2 ¶ c; Doc. 426 at 37:16-38:11, this tools-of-the-trade-evidence further confirms that Gomez's residence served as a premises for the primary purpose of distributing a controlled substance.

## CONCLUSION

Based on the foregoing, Gomez's objections to the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) and the additional two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(12) are overruled. Gomez's total offense level as currently calculated by Probation is unchanged. Doc. 375 at 11 ¶¶ 36-37, 12 ¶ 45. Formal sentencing will follow at a future date.

UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA